*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* Q. TOMS, Minor.

UNPUBLISHED
May 30, 2024

No. 368557
St. Clair Circuit Court
Family Division
LC No. 23-000169-NA

Before: GARRETT, P.J., and SERVITTO and REDFORD, JJ.

PER CURIAM.

Respondent-mother appeals as of right the trial court's order terminating her parental rights to her minor child, QT, under MCL 712A.19b(3)(b)(*ii*) (parent had opportunity to prevent physical injury or physical abuse but failed to do so) and MCL 712A.19b(3)(j) (reasonable likelihood of harm if returned to parent). We affirm the trial court's order but remand for the ministerial task of correcting a clerical error in the order terminating respondent's parental rights.

## I. FACTUAL BACKGROUND

This case arises out of a complaint Children's Protective Services (CPS) received on August 15, 2023, indicating that QT, who was two years old at the time, sustained an "acute spiral fracture of his left mid femoral bone" as a result of suspected nonaccidental trauma. The Department of Health and Human Services (DHHS) sought permanent custody of QT in its initial petition. On October 25, 2023, the trial court held a combined adjudication and termination of parental rights hearing.

At the hearing, CPS Investigator Rebecca Hartmann testified about her investigation of QT's injury. On August 15, 2023, respondent brought QT to an urgent care. She told the attending physician that she heard a pop when pushing QT's legs up to change his diaper. A lab technician supervisor collected an x-ray of QT's injury. After reviewing the x-ray, she reported the possibility of physical abuse to authorities because of her belief that such a severe injury would require a "substantial amount of force." The x-ray also indicated that QT suffered two additional fractures to his legs in different stages of the healing process. Transferred to the hospital, QT underwent surgery to set his broken femur and had a cast fitted. His doctors diagnosed QT with a "right midshaft femur fracture, nondisplaced transverse fracture of the proximal tibia on the left, and nondisplaced oblique facture of the midshaft of the right tibia which [was] healed."

After QT's transfer, respondent repeated to CPS investigators that she heard a snapping noise when she changed QT's diaper. CPS investigators also interviewed respondent's mother, Jerilynn Pasco at the hospital. Pasco reported that respondent told Pasco a different version of the incident. Respondent told Pasco that her boyfriend, Connor Atwood, broke QT's leg when changing his diaper. Physicians at the hospital told CPS investigators that the injury did not match respondent's original story and was consistent with nonaccidental trauma.

In a subsequent interview with CPS, respondent acknowledged that she lied to hospital staff and CPS because she did not want to get Atwood in trouble. However, after she saw how severe the injury was, she no longer could cover for him. Respondent reported that the day of the incident, she was asleep near Atwood and QT. Atwood attempted to change QT, who became "fussy." Atwood became angry and broke QT's leg. Respondent awoke to QT loudly screaming and crying. Respondent saw his leg swelling and knew he needed immediate medical attention. Atwood's and respondent's accounts of the incident differed from each other. Atwood admitted to breaking QT's leg by twisting it, but told CPS investigators that he woke respondent up before changing the diaper.

Respondent started dating Atwood several months before the diaper changing incident. Before she dated Atwood, respondent and QT lived with her parents without incident. QT was nonverbal and recently diagnosed with epilepsy. Because of his epilepsy, QT was unsteady on his feet and prone to falling.

Respondent started renting a one-bedroom apartment for herself and QT at the Yale Hotel. The building was a converted hotel. Respondent's unit had one room, a small closet, and a bathroom, but no kitchen. Atwood started living with respondent and QT. Pasco visited the apartment several times. On one occasion when respondent left QT with Atwood, Pasco and respondent returned to find QT in the closet with the door barricaded shut. After she forcefully opened the door, she saw a small dark space with a pile of blankets and toys. Angry after finding QT in the closet, Pasco told respondent to leave Atwood.

Respondent had her own concerns with Atwood. He burst out in fits of anger and violence in the mornings. He threatened suicide often. Respondent saw Atwood mistreat QT on multiple occasions, including Atwood placing QT on a teetertotter by himself, causing QT to fall, and Atwood pushing QT in a stroller down a skate ramp, causing QT to bruise. Atwood also spanked QT. Respondent admitted that she left QT in Atwood's care every night and frequently returned to find QT with new bruises. QT's bruises were usually located on his forehead and the back of his head. Respondent knew Atwood locked QT in the closet and knew Atwood was rough with QT. Respondent admitted to CPS that she knew Atwood was not fit to care for QT, yet continued to allow it to happen. Respondent also told Hartmann that when QT defecated himself, she would place him in the shower in a "downward dog" yoga position and spray him off.

Respondent theorized possible causes of QT's injuries in various stages of healing with her CPS investigator. QT suffered seizures from his epilepsy, which caused him to fall. In February 2023, he fell off an ottoman after having a seizure, resulting in injuries. QT also often kicked his legs back when he rode in his car seat. QT slipped and fell when he showered with Atwood. Respondent also thought the injuries could be a result of the teetertotter incident. The day after that incident, respondent took QT to his primary care doctor for a previously scheduled

appointment. She discussed QT's fall off the teetertotter with his physician. The physician ordered an x-ray, but respondent did not take QT to complete the scan.

In addition to Pasco, multiple relatives shared their concerns with respondent about Atwood. Relatives and friends offered to babysit QT for respondent, but she declined. Other tenants in the apartment building reported hearing Atwood scream at QT regularly and saw QT crying. The apartment manager said that, at one time, respondent requested that Atwood get a different room, which the manager said could be done; however, respondent then changed course and refused to have Atwood moved. Respondent lied to family members about the availability of another room for Atwood.

Dr. Bradley Norat, a child abuse pediatrician at Children's Hospital of Michigan and expert in the areas of child abuse and general pediatrics, testified that QT suffered an acute oblique fracture, meaning there were no signs of healing. The injury was consistent with someone forcefully pushing on the leg. Dr. Norat also examined QT's other two fractures. Dr. Norat could not estimate an exact age, but explained that the fractures occurred on different dates, most likely sometime after February 2023, but before August 2023. He explained that it was unlikely that the injuries occurred when QT fell off the ottoman. However, QT's fall off the teetertotter could have caused one, but not both of the injuries.

Respondent also testified at the termination hearing. She acknowledged that Atwood was mentally ill and a danger to QT. She broke up with him after the diaper changing incident. She denied that she ever saw Atwood act violently toward QT. Addressing the teetertotter incident, she explained that she did not have enough time to stop Atwood from placing QT on the teetertotter before QT fell. She explained that she did not take QT for an x-ray after that incident because he walked fine.

The trial court terminated respondent's parental rights under MCL 712A.19b(3)(b)(*ii*) and (j).[1] In support of both grounds, the trial court found that QT suffered three serious injuries. People close to respondent warned her to separate from Atwood. They saw that QT was afraid of Atwood and that Atwood had unaddressed mental health issues. Respondent ignored these warnings and stayed with Atwood instead of protecting her child. The trial court stated that respondent may be afraid that Atwood would manipulate her or commit suicide, but she was not afraid of him. The trial court also deemed respondent an inconsistent and untruthful witness. The trial court held that there was a reasonable likelihood that QT would suffer another injury or abuse if returned to respondent's home. The trial court stated that Atwood might not be in the picture anymore, but

---

[1] The termination order included MCL 712A.19b(3)(b)(*iii*) (nonparent adult's act caused the physical injury) in its finding that termination was in the best interests of the child. This was a typographical error. Although the DHHS sought termination under this statutory ground, the trial court did not terminate respondent's parental rights under this statutory ground at the termination hearing and the statutory ground is unmentioned in the remainder of the termination order. We remand for the ministerial task of correcting the order. MCR 6.435(A); MCR 7.216(A)(4).

respondent's attitude did not change. She did not take advice from people who cared about her, lived in the same room, and had no concept of caring for her child over a boyfriend.

The trial court also found that it was in QT's best interests to terminate respondent's parental rights under MCL 712A.19b(3)(b)(*ii*) and (j). QT lived with Pasco and his needs were met in her care. Pasco agreed to adopt QT if QT did not reunify with his father. The trial court acknowledged that QT had a bond with respondent; however, that bond was outweighed by respondent's parenting ability. In the few months that respondent lived apart from her parents, QT sustained three leg fractures and continued to suffer head injuries. Respondent ignored repeated warnings about Atwood. The trial court found there was a reasonable likelihood that QT would be at risk of harm if returned to respondent's care because of the aforementioned findings. Respondent continued to minimize her mistakes during her testimony, which indicated that she did not learn from the incident and would not be able to provide a safe environment for QT. The trial court stated that if respondent could not learn from this serious incident and take responsibility, she would never learn. This appeal follows.

## II. STANDARD OF REVIEW

"In order to terminate parental rights, the trial court must find by clear and convincing evidence that at least one of the statutory grounds for termination in MCL 712A.19b(3) has been met." *In re VanDalen*, 293 Mich App 120, 139; 809 NW2d 412 (2011). We review the trial court's determination for clear error. *Id.*; MCR 3.977(k). After the trial court determines that at least one of the statutory grounds has been met, the trial court must also find by a preponderance of the evidence that termination is in the child's best interests before it can terminate parental rights. *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013). We also review the trial court's finding regarding the child's best interests for clear error. See *In re Trejo*, 462 Mich 341, 356-357; 612 NW2d 407 (2000). "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *In re Moss*, 301 Mich App at 80 (quotation marks and citation omitted).

## III. STATUTORY GROUNDS

Respondent contends that the trial court clearly erred by terminating her parental rights because there was no evidence that QT's injuries were nonaccidental. She further contends that she did not have the opportunity to prevent injury to QT and she no longer has any contact with Atwood. We disagree that the trial court erred.

A trial court may terminate parental rights under MCL 712A.19b(3)(b)(*ii*) if it finds by clear and convincing evidence that the child suffered physical abuse and "[t]he parent who had the opportunity to prevent the physical injury or physical or sexual abuse failed to do so and the court finds that there is a reasonable likelihood that the child will suffer injury or abuse in the foreseeable future if placed in the parent's home." Under this statutory ground, the physical injury "must be caused by a parent's act or a nonparent adult's act and not merely contributed to by an unintentional omission." *In re LaFrance, Minors*, 306 Mich App 713, 725; 858 NW2d 143 (2014) (quotation marks and citation omitted). Accordingly, MCL 712A.19b(3)(b)(*ii*) "is intended to address the parent who, while not the abuser, failed to protect the child from the other parent or nonparent

-4-

adult who is an abuser." *Id*. Evidence that a respondent put her own desires above the needs of her child supports termination under this statutory ground. *In re Gonzales/Martinez*, 310 Mich App 426, 432; 871 NW2d 868 (2015).

The trial court did not clearly err when it found that termination of respondent's parental rights was appropriate under MCL 712A.19b(3)(b)(*ii*). As noted, this statutory ground pertains to a parent who, although not an abuser, failed to protect her child from another parent or nonparent adult who is an abuser. *In re LaFrance, Minors*, 306 Mich App at 725. Despite respondent's contention otherwise, the record supports that QT's injuries were nonaccidental. Dr. Norat testified that QT's broken femur was consistent with someone forcefully pushing QT's leg. This injury was inconsistent with an accident. Atwood admitted to CPS investigators that he twisted QT's leg when he became angry during a diaper changing. Before the diaper changing incident, respondent had warnings of the danger Atwood presented to QT. Respondent left QT in Atwood's care every night and would frequently return to find QT with new bruises. She knew Atwood acted roughly toward QT and that Atwood locked QT in a closet. She saw instances in which Atwood placed QT on a teetertotter without support and pushed him in a stroller down a skate ramp. The teetertotter incident was a potential cause of one of QT's healing fractures.

In addition, respondent ignored her family members' repeated warnings about the danger Atwood presented to QT. She continuously placed QT in Atwood's care despite his continued bad decisions with her child. Respondent knew Atwood had unaddressed mental illnesses, knew he had frequent angry outbursts, and knew he yelled at both her and QT, but she still left him in charge of watching QT when she worked. She had the opportunity to use other babysitters, including both her mother and stepmother, but she declined those offers. She failed to leave Atwood or remove him from her apartment, even when another room became available for him to use. This evidence showed that respondent put Atwood over her child, ignoring his safety and well-being. See *In re Gonzales/Martinez*, 310 Mich App at 432.

Even accepting that respondent left Atwood, QT continued to face a risk of harm. At the termination hearing, respondent continued to make excuses to minimize her culpability and showed no indication that she learned from the diaper changing incident or any of the other incidents. QT suffered three serious leg injuries and showed significant bruising on his head, only some of which can be explained. Respondent did not take proper safety precautions to protect QT from falling, such as bathing QT instead of placing him in the shower. Such precautions were necessary given his epilepsy. This exposed QT to injury, abuse, and the risk of future abuse. We conclude that the trial court did not commit clear error by terminating respondent's parental rights under MCL 712A.19b(3)(b)(*ii*).[2]

## IV. BEST INTERESTS

---

[2] The trial court need only establish one statutory ground by clear and convincing evidence to terminate parental rights. *In re Ellis*, 294 Mich App 30, 32; 817 NW2d 111 (2011). Therefore, we need not address the remaining ground relied upon by the trial court.

Respondent also argues that the trial court erred by finding that termination was in QT's best interests because she and QT had a strong bond and there was no evidence that she lacked parenting skills. We disagree.

"If the court finds that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of parental rights and order that additional efforts for reunification of the child with the parent not be made." MCL 712A.19b(5). "[T]he focus at the best-interest stage" is on the child, not the parent. *In re Moss*, 301 Mich App at 87. The trial court should weigh all the evidence available on the record to determine the child's best interests. *In re Trejo*, 462 Mich at 356-357. The trial court may consider a variety of factors that may include "the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014) (quotation marks and citation omitted). "The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption." *Id*. at 714. Moreover, "[a] child's placement with relatives is a factor that the trial court is required to consider." *In re Gonzales/Martinez*, 310 Mich App at 434. Although a relative placement weighs against termination, it is not dispositive because a trial court "may terminate parental rights in lieu of placement with relatives if it finds that termination is in the child's best interests." *In re Olive/Metts Minors*, 297 Mich App 35, 43; 823 NW2d 144 (2012).

The trial court did not clearly err by finding that termination was in QT's best interests. The trial court examined the bond between respondent and QT, respondent's parenting ability, QT's need for stability, and the advantages of QT's foster home over respondent's home. Although QT and respondent had a bond, this bond was outweighed by respondent's poor parenting skills. The evidence demonstrated that respondent lacked parenting skills. Respondent failed to keep QT safe. Despite often seeing new bruises on QT when left in Atwood's care, she continued to leave QT in Atwood's care almost every night when she went to work. She showed poor judgment when she ignored repeated warnings from both her mother and stepmother about how Atwood treated QT. She allowed QT to be left in a closet, showered him in a downward dog position, and failed to take precautions to prevent falls which could be more damaging than normal given his epilepsy. These incidents demonstrate poor parenting skills.

The evidence also demonstrated that QT's foster home had advantages over respondent's home. QT did well in his placement with respondent's mother. His speech improved. He suffered no additional injuries or seizures. He was in a stable home with potential for adoption. QT's living situation was dramatically more stable and safer. Overall, the trial court's best-interest determination on the record does not leave a "definite and firm conviction that a mistake has been committed . . . ." *In re Moss*, 301 Mich App at 80 (quotation marks and citation omitted).

Affirmed. We remand for the ministerial correction of the clerical error in the trial court's order as explained in this opinion, *supra,* at footnote 1. We do not retain jurisdiction.

/s/ Kristina Robinson Garrett
/s/ Deborah A. Servitto
/s/ James Robert Redford

-6-